**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 25-1736**

---

ROCK SPRING PLAZA, II, LLC,

       Plaintiff - Appellee,

    v.

INVESTORS WARRANTY OF AMERICA, LLC; ROCK SPRINGS DRIVE, LLC,

       Defendants - Appellants,

    and

JANE DOES,

       Defendant.

---

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Julie R. Rubin, District Judge.  (8:20-cv-01502-JRR)

---

Argued:  March 19, 2026                    Decided:  June 10, 2026

---

Before WYNN, THACKER, and BERNER, Circuit Judges.

---

Affirmed by unpublished per curiam opinion.

---

**ARGUED:**  Kevin B. Getzendanner, ARNALL, GOLDEN & GREGORY LLP, Atlanta, Georgia, for Appellants.   William M. Bosch, PILLSBURY WINTHROP SHAW

PITTMAN LLP, Washington, D.C., for Appellee. **ON BRIEF:** Rebecca Allison Davis, ARNALL, GOLDEN & GREGORY LLP, Atlanta, Georgia, for Appellant Investors Warranty of America, LLC. Sara Elizabeth Kropf, KROPF MOSELEY SCHMITT PLLC, Washington, D.C., for Appellant Rock Springs Drive LLC. Deborah B. Baum, Thomas L. Howard III, Washington, D.C., Jeffrey P. Metzler, PILLSBURY WINTHROP SHAW PITTMAN LLP, New York, New York, for Appellee.

────────────

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Investors Warranty of America ("IWA") is the leasehold tenant of a commercial property in Bethesda, Maryland. Rock Spring Plaza II, LLC ("Appellee") owns that property. In 2017, IWA decided that its leasehold of the property was not financially viable. So, IWA devised an exit strategy. Its plan was to create a new organization, Rock Springs Drive ("RSD"), over which IWA would retain almost total control. IWA then planned to assign its leasehold interest to RSD and dissolve RSD after Maryland's statute of limitations for fraudulent conveyances had expired, thus leaving Appellee without a leasehold tenant or any means of legal redress.

But Appellee learned of the plan and sued IWA, RSD, and Transamerica Life Insurance Company ("Transamerica"), IWA's parent company (together, "Appellants"). Appellee alleged that the assignment of the lease obligations from IWA to RSD constituted a fraudulent conveyance in violation of both the lease and Maryland law. Appellee further alleged that Appellants are alter egos of one another, such that IWA may be held liable for any wrongdoing by RSD. A jury found that the assignment was not allowed by the parties' agreement, that it was a fraudulent conveyance for the purposes of Maryland law, and that IWA and RSD are alter egos of one another.

In this appeal of that verdict, Appellants argue that they were entitled to judgment as a matter of law on each of Appellee's claims. Appellants further assert that the district court wrongly excluded proffered evidence and incorrectly instructed the jury.

For the reasons detailed below, we affirm the judgment in all respects.

3

I.

A.

The Lease

Anne Camalier was the original owner of an undeveloped plot of land in Bethesda, Maryland (the "Property"). In 1990, she executed a 99 year ground lease (the "Lease") between herself as the owner of the Property and herself as the "general partner" and "president" of Rock Spring II Limited Partnership ("RSLP"). J.A. 138.[1] The Lease established a baseline annual rent to be paid in monthly installments. It also stipulated that the rent must increase each year to the greater of 103 percent of the prior year's rent or "the then current Fair Rental Value of the Premises." *Id.* at 86. The Lease also granted RSLP or any future tenant the right to assign or mortgage the leasehold interest.

In November 1991, RSLP obtained a construction loan in the amount of $27 million from Commonwealth Life Insurance Company, in order to fund construction of an office building on the Property. RSLP completed construction and began subleasing to commercial tenants in 1992.

Sometime prior to June 2006, Anne Camalier transferred her ownership of the Property to Appellee, an entity also owned and controlled by Anne Camalier. Sometime later, Charles "Chris" Camalier, III -- Anne Camalier's son -- became the primary representative of Appellee. Then, in June 2006, RSLP entered into an agreement with Monumental Life Insurance Company ("MLIC") in order to refinance its 1991 construction

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

loan for $30 million.  RSLP offered its leasehold interest in the Property as collateral to secure the new loan.  As part of that deal, Appellee, RSLP, and MLIC all entered into a new agreement (the "Estoppel Agreement") to modify and supplement the Lease.  Only Section 19 of the Estoppel Agreement is at issue in this case.  That section states:

> [N]o limitation upon or condition to any assignment of the Lease shall apply to any transfer of the Lease by foreclosure . . . or an assignment in lieu thereof. If the Lender acquires the Tenant's interest in the Lease . . . the Lender shall have the absolute right to assign the same or sublease all or any portion of the Premises to any third party. So long as such third party assumes all of the Tenant's obligation under the Lease the Lender shall be automatically released from any further liability thereunder following any such assignment except for any of the Lender's obligations or liabilities under the Lease arising during the Lender's period of ownership.

J.A. 150.

In October 2007, MLIC assigned its interest as mortgagee to AEGON Global Institutional Markets PLC ("Aegon").  Then, in January 2009, Aegon assigned its interest as mortgagee to Transamerica.

On September 22, 2011, Chris Camalier, on behalf of RSLP, notified Transamerica that RSLP was out of money and would, therefore, imminently default on both its lease and loan obligations.  Camalier further explained that if Transamerica did not intervene, Appellee would be forced to terminate the lease, which was the collateral securing the Transamerica loan.  To avoid that outcome, Camalier proposed that Transamerica take over the lease and assume RSLP's rental payments to Appellee.

As a result, on December 28, 2011, Transamerica transferred its interest as mortgagee to one of its subsidiaries, IWA.  IWA foreclosed on the leasehold interest.  Then, in February 2012, IWA purchased the leasehold interest for $3.7 million.  Thus, as of

5

February 2012, IWA was both the tenant of the Property and the mortgagee of a loan secured by IWA's own interest as a tenant. At the time IWA took over the lease, rents totaled around $122,000 each month. And as explained above, the Lease requires the rental amount due to increase by not less than three percent every year for the entire 99 year lease term.

B.

The Operating Agreement

IWA struggled for the next five years to make the Property profitable but had little success. So, on behalf of IWA, accountants for Transamerica consulted with advisors from Aegon USA Realty Advisors, LLC ("AURA") to assess whether and how IWA could make its lease of the Property economically viable.

In a July 2016 email exchange, AURA personnel concluded that the Property was unlikely to become profitable without substantial changes to the Lease. The challenge was one of supply and demand. At that time, there was a relatively large amount of office space available for lease in Bethesda, where the Property is located. And AURA's analysis suggested that commercial vacancies would continue increasing in the near term. Consequently, rent prices for office space in Bethesda were trending downward. But the Lease fixed rent at a relatively high rate and required that rent to continue increasing each year despite those market headwinds. Thus, as an AURA employee put it, "market lease deals don't allow [IWA] to break even . . . . So, the prospects for leasing space in [IWA's] building is not promising." J.A. 1644.

6

In response to AURA's analysis, an accountant with Transamerica inquired, "Given [that IWA's lease of the Property] is worthless, is there any exit strategy on this to get it off the books[?] Is it even possible to just walk away from the [Lease]?"  J.A. 1643. Another Transamerica accountant chimed in, "[t]houghts on an exit strategy that you want to share with [Transamerica's] Corporate [office]?"  *Id.*  An AURA consultant responded, "[w]e've recently engaged outside counsel to explore an exit which would stop the monthly losses and any future liability."  *Id.*

That outside counsel was Paul Rubin and Troy Taylor of the Algon Group ("Algon").  Rubin and Taylor came up with a simple solution to IWA's problem -- that is, as explained more below, IWA would create a new entity, assign it the Lease, then dissolve the entity.  That solution was eventually memorialized in an agreement between IWA and Algon (the "Operating Agreement").

The Operating Agreement provided that Algon would form a new single purpose entity, RSD, "to own, lease, market, operate, and sell the leasehold interest in [the Property]."  J.A. 1654.  RSD would be formally managed by another single purpose entity, Longshore Ventures LLC ("Longshore"), which would in turn be managed by Taylor and Rubin.  After an initial capital infusion from IWA equal to roughly three years of operating expenses, Rubin and Taylor would attempt for three years to either make the Property profitable or to locate a party interested in purchasing and taking over the leasehold.  In the words of David Feltman, an AURA employee, Algon would manage the Property with "[a] short leash on partnership term [sic] so that we can pull the plug or re-evaluate after 3 years."  *Id.* at 1647.  In the interim, Algon would receive management fees for its work but

7

otherwise would not receive any profits from the arrangement until IWA had recouped all of its investments. The deal thus represented "[a] big cookie for Algon if they can really make this work – leaseup [sic] the property and sell at a profit (after we get [return on capital] and [initial rate of return]) – a liberal waterfall." *Id.*

The plan also ensured that IWA would retain ultimate control of RSD and the Property. The Operating Agreement allocated IWA a 98 percent ownership of RSD, with the remaining two percent owned by Longshore. And IWA retained the right to purchase the two percent interest of Longshore at any time for $1,000. Further, the Operating Agreement does not permit Longshore to incur any new obligations or enter any new subleases without the express consent of IWA. As Feltman explained, the agreement imposes "[a] big stick to prevent Algon from incurring expenses beyond [IWA's] capital contribution – so not creating any creditors other than the ground lessor." J.A. 1647. In addition, the Operating Agreement states that neither Rubin nor Taylor would be permitted to make any contact with Appellee or its representatives for the first 38 months of RSD's tenancy.

Most significantly, the Operating Agreement provides for three "dissolution events," at the first of which RSD would be automatically dissolved: (1) August 1, 2026; (2) the entry of a decree of judicial dissolution pursuant to the Maryland Limited Liability Company Act, Md. Code Ann., Corps. & Ass'ns, § 4A-101 *et seq.*; or (3) the vote or written consent of 90%-in-Interest of the Members. *Id.* at 1803. Because IWA had a 98 percent interest in RSD, this third dissolution event functionally gave IWA the power to dissolve RSD at any time and for any reason. And as an attorney for RSD explained, in the event

8

of dissolution, "[RSD] would be turning the keys over to the landlord" -- that is, returning possession to Appellee and declining to pay any future rents. *Id.* at 896.

## C.

## The Assignment

Algon formed RSD on or about August 28, 2017. IWA submitted an initial capital contribution to RSD of $3.9 million, "barely enough rent for three years." Response Br. at 7. Then, on August 31, 2017, IWA assigned its leasehold in the Property to RSD. IWA did not record that assignment. On the same day, Feltman sent a letter to Appellee that stated, in its entirety:

> To Whom it May Concern:
>
> Pursuant to Sections 12 and 19 of the [Estoppel Agreement], [IWA] has entered into an Assumption and Assignment of . . . Lease, dated August 31, 2017, with [RSD], a Maryland limited liability company.
>
> If you have any questions, please contact Robert Barron [attorney for RSD].

J.A. 1767.

Upon receiving the letter, Appellee contacted Barron and requested information about its new tenant. Appellee specifically wanted to know whether RSD had the ability to fulfill its obligations pursuant to the Lease. Six months passed without a response. So, on February 22, 2018, counsel for Appellee sent a letter to Barron complaining that RSD was ignoring Appellee's reasonable inquiries. Appellee again requested information about RSD and also asked to arrange an in person meeting with an RSD representative.

On March 30, 2018 -- seven months after Appellee first contacted Barron requesting information about RSD -- Barron finally replied. Barron denied Appellee's accusation that

9

RSD had declined to share the requested information. As Barron put it, "[Appellee] has been advised of the identity of the Tenant -- [RSD]." J.A. 1710. Barron then declined either to share additional information about RSD or to arrange a meeting between Appellee and RSD.

On April 25, 2018, counsel for Appellee wrote another letter to Barron requesting "basic contact information" for RSD, "including a point of contact with whom [Appellee] can discuss day-to-day operational issues concerning [the Property]," as well as the "strategic and proprietary commercial activity and business plans" of RSD. J.A. 1715–16. Barron did not respond. Appellee's counsel then wrote yet another letter to Barron on June 6, 2019, again requesting the same information. Barron replied with a letter dated June 13, 2019, in which he again refused to provide any information about RSD. But Barron explained that if "[Appellee] is willing to restructure the entire rental obligations [sic] under the . . . Lease and/or provide financing on acceptable terms . . . then, [RSD] would be interested in pursuing discussions with [Appellee]." *Id.* at 1733.

Longshore struggled to find either new sub-tenants or a buyer for IWA's leasehold interest. Consequently, the Property remained unprofitable, and RSD continued to pay more than $120,000 each month in rent to Appellee.

D.

The Lawsuit

At some point, Appellee came to suspect that its new tenant, RSD, was actually a subsidiary of IWA and that IWA was using RSD as a means to escape its lease obligations. So, Appellee sued RSD, IWA, and several unidentified "Jane Doe" defendants on June 5,

10

2020. Appellee alleged that IWA's assignment to RSD was a fraudulent, invalid conveyance in violation of the Estoppel Agreement and Maryland Law.[2]

Per Appellee's theory, as of 2017, IWA no longer intended to make the Property profitable or to remain in the Lease for the full 99 year term. Instead, IWA assigned its rights and obligations to RSD as part of an "exit strategy . . . to get [the Lease] off [IWA's] books." J.A. 1643. The plan was that IWA would keep Appellee in the dark about its assignment to RSD for three years, which is the duration of Maryland's statute of limitations for fraudulent conveyances. As Taylor would later explain, no one associated with RSD "could[] talk to [Appellee] without IWA's approval." *Id.* at 872. During that time, IWA would minimize its losses on the Property by tightly controlling the capitalization and management decisions of RSD. Then, after the statute of limitations had tolled, IWA would exercise its right to unilaterally dissolve RSD pursuant to the Operating Agreement. And without the capacity to challenge the conveyance in court, Appellee would be left without redress and without a tenant, and IWA would be freed of any future lease obligations.

Thus, Appellant sought a declaratory judgment that (1) the assignment was invalid pursuant to the Estoppel Agreement; (2) RSD is the alter ego of IWA; (3) the assignment was fraudulent for the purpose of Maryland law; and (4) Appellee may collect rent from IWA for the remainder of the lease.

---

[2] At the instruction of the district court, Appellee later amended its complaint and joined Transamerica as a defendant. But the question of Transamerica's liability was never submitted to the jury.

11

E.

The Trial

Before trial, Appellee filed three motions in limine relevant to this appeal. First, Appellee moved to exclude evidence of RSLP's 2011 default on both its refinanced loan with Transamerica and its lease obligations to Appellee. Second, Appellee moved to exclude testimony from Douglas Bregman, an attorney Appellants intended to call as an expert on real property transactions. And finally, Appellee moved to exclude testimony from Ian Ratner, an accountant whom Appellants planned to call for expert testimony regarding the adequacy of RSD's capitalization. The district court granted each of those motions.

On September 10, 2024, following a 15 day jury trial, the jury returned a verdict for Appellee. Via a special verdict form, the jury found that Appellee had proved by a preponderance of the evidence that (1) IWA's assignment to RSD was invalid and (2) RSD is the alter ego of IWA. The jury also found that Appellee had proved by clear and convincing evidence that IWA had assigned its lease to RSD with the intent to defraud Appellee.

The district court entered final judgment on October 10, 2024, invalidating IWA's assignment to RSD and declaring that (1) RSD is the alter ego of IWA; (2) any future assignments of IWA's lease obligations must be to bona fide third parties with the independent means to fulfill the tenant's obligations pursuant to the Lease and the Estoppel Agreement; and (3) Appellee has the right to request information as to any future assignee in order to ensure their capacity to comply with those obligations.

12

After entry of judgment, Appellants filed motions for directed verdicts on all counts, or, in the alternative, for a new trial. The district court denied those motions in their entirety.

Appellants timely appealed.

## II.

## A.

### Assignment & Alter Ego Liability

Appellants make three arguments on appeal: (1) The Estoppel Agreement allows IWA to assign its leasehold interest to RSD; (2) because the Estoppel Agreement permits that assignment, the assignment cannot be fraudulent as a matter of Maryland law; and (3) relatedly, because alter ego liability requires some wrongful conduct, Appellants cannot be held to be alter egos of one another because no wrongful conduct took place. We first address whether Appellants are entitled to judgment on the issue of wrongful assignment. Then, we proceed to the questions of fraudulent conveyance and alter ego liability, respectively.

### 1.

### Standard of Review

We review a district court's denial of a motion for judgment as a matter of law de novo. *Al Shimari v. CACI Premier Tech. Inc.*, 170 F.4th 162, 172 (4th Cir. 2026). Viewing the record in the light most favorable to the Appellee, we may direct verdict for Appellants only if no reasonable jury could have found for Appellee. *Id.*

13

2.

Wrongful Assignment

The agreements here are governed by Maryland law. Maryland follows the "objective theory of contract interpretation," which affords primacy to the intentions of the parties as articulated in the ordinary meaning of the text of their agreement. *Lithko Contracting, LLC v. XL Ins. Am., Inc*, 318 A.3d 1221, 1230 (Md. 2024). When the text of an agreement is susceptible to only one reasonable interpretation, and thus is "clear and unambiguous," the objective theory posits that the parties are bound by that meaning regardless of any divergent, subjective interpretations. *Credible Behavioral Health, Inc. v. Johnson*, 220 A.3d 303, 310–11 (Md. 2019). In unambiguous agreements, the "ordinary and accepted meaning" of the language controls. *Id.* at 311. "Contractual language is ambiguous where a reasonably prudent person could ascribe more than one reasonable meaning to it." *Id.* The meaning of an unambiguous contract term is a question of law, as is the question of whether a term is ambiguous. *Id.*

In this case, the parties agree that Section 19 of the Estoppel Agreement controls this issue. Section 19 states:

> [N]o limitation upon or condition to any assignment of the Lease shall apply to any transfer of the Lease by foreclosure . . . or an assignment in lieu thereof. If the Lender acquires the Tenant's interest in the Lease . . . the Lender shall have the *absolute right* to assign the same . . . to *any third party*. So long as such third party assumes all of the Tenant's obligation[s] . . . Lender shall be automatically released from any further liability.

J.A. 150 (emphasis supplied).

14

Here, IWA, as "the Lender," acquired RSLP's interest as "the Tenant," rather than assigning or transferring the interest in foreclosure proceedings. Thus, IWA has "the absolute right to assign [the leasehold]" "to [a] third party." J.A. 150. And IWA will be released from future obligations only if that third party "assumes *all* of [IWA's] obligation[s]." *Id.* (emphasis supplied).

Further, the parties agree that Section 19 is unambiguous. We agree, and as a result, the ordinary meaning of the text controls. But, critically, the parties disagree on whether RSD is a "third party" and whether RSD has "assume[d] all of [IWA's] obligations." *Id.* Because these conditions are conjunctive -- that is, because both must be satisfied for IWA to be released from its obligations -- we must affirm the district court unless Appellants prevail on both points.

a.

"Third Party"

Black's Law Dictionary defines a "third party" as "[s]omeone other than the principal parties in a matter; someone who is not a party to a lawsuit, agreement, or other transaction but who is usually somehow implicated in it." *Third Party*, Black's Law Dictionary (12th ed. 2024). Similarly, Merriam Webster defines "third party" as "a person other than the principals" to an agreement. *Third party*, Merriam-Webster (last accessed Mar. 24, 2026), https://unabridged.merriam-webster.com/unabridged/third%20party [https://perma.cc/QS77-2VG6].

We conclude that in this context, the term "third party" is unambiguous and does not include RSD. As explained above, IWA has total control over RSD. Indeed, IWA has

15

the power to dissolve RSD at any time and for any reason. To this day, IWA is RSD's sole source of capital. And pursuant to the Operating Agreement, RSD's managers cannot undertake any new obligations or even any new subleases without the express approval of IWA. The corporate distinction between IWA and RSD is thus a formality without real substance: To deal with RSD is to deal inevitably with IWA. Consequently, we affirm the judgment and the district court's denial of the motion to direct verdict for Appellants on this issue.

b.

"Assume"

Similarly, we hold that the term "assume" is unambiguous in this context and that RSD did not "assume" the obligations of IWA pursuant to the Estoppel Agreement. To "assume" is to "to take to or upon oneself" or "to take as one's right or possession." *Assume*, Merriam-Webster (last accessed Mar. 24, 2026), https://unabridged.merriam-webster.com/unabridged/assume [https://perma.cc/ES2D-B8W8]; *see also Assumption*, Black's Law Dictionary (12th ed. 2024) ("The act of taking (esp. someone else's debt or other obligation) for or on oneself . . . .").

But the Operating Agreement guarantees that RSD will cease to exist no later than August 2026. Because the term of the Lease runs until November 2089, it is literally impossible for RSD to have assumed all of the obligations of IWA. Thus, because no reasonable person could conclude that RSD assumed all of the lease obligations of IWA, we hold that a reasonable jury could have found that IWA's assignment was not permitted by the Lease or the Estoppel Agreement. Consequently, we again affirm the judgment and

16

the district court's denial of the motion for a direct verdict in favor of Appellants on the issue of wrongful assignment.

3.

Fraudulent Conveyance

The next issue we confront is whether the assignment from IWA to RSD constitutes a fraudulent conveyance for the purpose of Maryland law.[3]  In Maryland, "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud present or future creditors, is fraudulent as to both present and future creditors."  Md. Code Ann., Comm. L. § 15-207.  A "'[c]onveyance' includes every . . . assignment, release, transfer, lease, mortgage, or pledge of tangible or intangible property."  *Id.* § 15-201(c).  A "[c]reditor" is "a person who has any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed, or contingent."  *Id.* § 15-201(d).  And Section 15-207 reaches "*any* legal liability," including obligations arising under a lease of real property.  *Id.* § 15-201(e) & 207 (emphasis supplied).  Thus, the question presented is whether a reasonable jury could have concluded that IWA assigned its leasehold to RSD "with actual intent . . . to hinder, delay, or defraud" Appellee of its right to rental payments.

Appellants make two arguments as to why the assignment does not violate Maryland law.  First, they argue, "[a] party that complies with its contract cannot be held liable for

---

[3] When sitting in diversity, as here, we apply the substantive law of the forum state. *Kritter v. Mooring*, 142 F.4th 267, 273 (4th Cir. 2025).

17

other claims arising from that conduct." Opening Br. at 34 (citing *Carty v. Westport Homes of N. C., Inc.*, 472 F. App'x 255, 259 (4th Cir. 2012)).  Second, Appellants argue, "IWA's assignment of the lease to RSD is not a conveyance within the ambit of [Section 15-207]." *Id.* at 38.

Both of these arguments are misplaced.  First, *Carty* does not stand for the proposition Appellants allege.  In *Carty* -- an unpublished and, therefore, unprecedential case -- we held that a party cannot claim that it was fraudulently induced into an action that the party was contractually required to perform.  *See Carty*, 472 Fed. App'x at 259.  Here, however, there is no allegation that either IWA or Appellee were contractually required to take any relevant action.  So, *Carty* is inapplicable.  Beyond that, Appellants' point is moot because, as we explain above, Appellants breached their contractual obligations.  *See infra* Section II.A.2.

Second, contrary to Appellants' assertion, Section 15-207 applies to this case.  In Maryland, "[e]*very conveyance* made . . . with actual intent . . . to hinder, delay, or defraud future creditors . . . is fraudulent."  Md. Code Ann., Comm. L., § 15-207 (emphasis supplied).  "'Conveyance' includes *every . . . assignment . . .* of tangible or intangible property," *id.* § 15-201(c) (emphasis supplied), and the statute reaches "*any* legal liability." *Id.* § 15-201(e) (emphasis supplied).  The Lease plainly establishes liabilities in the form of rents due each month and the right to use and enjoyment of the Property by the tenant. IWA assigned those rights and obligations to RSD.  And according to Appellee, IWA did so with the intent of dissolving RSD after running out the statute of limitations on fraudulent conveyances, thus freeing itself of any obligations and depriving Appellee of

the benefits of its agreement. Thus, Appellee's allegation of fraud fits squarely within Section 15-207.

In addition, there was more than enough evidence presented at trial for the jury to credit Appellee's theory of fraud. As but a few examples, the evidence demonstrates that IWA formed RSD mere days before assigning RSD its lease obligations. And several Transamerica and AURA employees plainly stated their intention to create RSD so that IWA could "walk away" from its obligations pursuant to the Lease. J.A. 1627–29. As one AURA employee put it, IWA's plan was to "engage[] outside counsel to explore an exit which would stop the monthly losses and any future liability." *Id.* at 1643. That "exit" was the assignment of the lease obligations of IWA to RSD.

Further, the Operating Agreement grants IWA the right to dissolve RSD at any time and in fact *requires* that RSD be dissolved no later August 2026. Indeed, IWA initially contributed only enough capital to RSD for three years of operation. IWA also tightly restricted Longshore's ability to run the business by incurring new debts and revenue streams. Finally, IWA expressly forbade any RSD representative from divulging information about RSD to Appellee for 38 months after the assignment -- a duration that happens to coincide with Maryland's three year statute of limitations for fraudulent conveyances.

Thus, because Maryland's law against fraudulent conveyance plainly applies, and because the jury heard sufficient evidence to find for Appellee on this issue, we again affirm the judgment and the district court's denial of directed verdict for Appellants.

19

4.

Alter Ego Liability

Appellants next assert that as a matter of law, RSD is not the alter ego of IWA. Appellants argue that in this case, the issue of alter ego liability is "virtually indistinguishable from" the fraudulent conveyance claim because alter ego liability requires a demonstration of fraud. Opening Br. at 41. And recall that Appellants also argue that there can be no fraudulent conveyance because the Estoppel Agreement permits the assignment from IWA to RSD, and does so because RSD is a third party -- not an alter ego of IWA. Thus, Appellants here make the same circular argument that pervades the whole case: There can be no fraud because Appellants are not alter egos, and they are not alter egos because they did not commit fraud.

Alter ego doctrine allows courts to treat two nominally distinct business organizations as the same entity when "the corporate entity [of one organization] has been used as a subterfuge" by another. *Hildreth v. Tidewater Equip. Co.*, 838 A.2d 1204, 1210 (Md. 2003). The doctrine should be applied "'with great caution and reluctance' and only in 'exceptional circumstances.'" *Id.* A plaintiff must prove three elements for the doctrine to apply:

> (1) "[C]omplete domination, not only of the finances, but of policy and business practice in respect to the transaction so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own"; (2) that "such control [was] used by the defendant to commit fraud or wrong, to perpetrate the violation of the statutory or other positive legal duty, or dishonest and unjust act in contravention of the plaintiff's legal rights"; and (3) that such "control and breach of duty proximately caused the injury or unjust loss."

20

*Id.* (quoting Fletcher Cyc. Corp. § 41.10).  In assessing whether the first element has been met, Maryland courts typically apply five non-exclusive factors:

> (1) [W]hether the corporation is inadequately capitalized, fails to observe corporate formalities, fails to issue stock or pay dividends, or operates without a profit, (2) whether there is commingling of corporate and personal assets, (3) whether there are non-functioning officers or directors, (4) whether the corporation is insolvent at the time of the transaction, and (5) the absence of corporate records.

*Id.* (quoting 1 Fletcher Cyc. Corp. § 41.10).

Appellants argue that as a matter of law, Appellee failed to demonstrate that Appellants are alter egos of one another.  They offer one reason in explanation: "Because the Assignment was contractually permitted, it cannot be considered fraudulent as to [Appellee], which negates the premise for piercing the corporate veil."  Opening Br. at 41. In support, Appellants cite *Bart Arconti & Sons, Inc. v. Ames-Ennis, Inc.*, 340 A.2d 225 (Md. 1975), for the proposition that alter ego liability requires a demonstration of fraud, "even if a sham corporation was set-up [sic] for the sole purpose of evading legal obligations."  Opening Br. at 42.

Setting aside the oddity of Appellants' assertion that a "sham corporation" created to "evade legal obligations" would somehow not be deemed fraudulent, Appellants' point is moot because, as we explain above, Appellants breached their agreement and the jury made a valid finding of fraud.  Even so, *Bart Arconti & Sons* does not stand for the proposition that Appellants claim it does.  There, Maryland's highest court[4] said,

---

[4] Until 2022, Maryland's highest court was known as the "Maryland Court of Appeals."  That year, Maryland voters renamed the court to the "Maryland Supreme
(Continued)

"shareholders generally are not held individually liable for debts or obligations of a corporation except where it is necessary to prevent fraud *or enforce a paramount equity*." *Bart Arconti & Sons*, 340 A.2d at 234 (emphasis supplied). And the Maryland Court of Appeals has clarified since *Bart Arconti*, "under Maryland law, where there is no allegation of fraud, evidence or finding of fraud, the corporate veil may be disregarded nonetheless and personal liability established upon proof of a paramount equity." *Schlossberg v. Bell Builders Remodeling, Inc.*, 109 A.3d 1146, 1146 (Md. 2015). Thus, even if there were no finding of fraud -- but there was -- Appellants' nominal corporate distinctiveness could still be set aside if equity so required.

Applying the correct rule of law, the jury heard more than enough evidence to disregard Appellants' argument.

First, IWA completely dominates RSD. All the funding of RSD comes from IWA, and IWA disburses only enough money to RSD to cover its rent obligations. Initially, IWA provided only enough capital to keep RSD solvent for three years. Pursuant to the Operating Agreement, RSD's managers are not permitted to take any meaningful action without IWA's consent. Indeed, initially, RSD was not even allowed to contact Appellee, the landlord of the property RSD exists to operate. Thus, there is substantial evidence that RSD has "no separate mind, will or existence of its own." *Hildreth*, 838 A.2d at 1210.

---

Court." *See Robinson v. Pa. Nat'l Mu. Cas. Ins. Co.*, No. 23-1529, 2024 WL 3064727, at *1 n.1 (4th Cir. 2024).

Second, IWA created RSD and assigned RSD its leasehold interest for the purpose of evading its obligations to Appellee.  In sum, the evidence amply demonstrates that IWA planned to operate RSD for three years while keeping Appellee in the dark as to its near total control by IWA.  Then, once the Maryland statute of limitations on fraudulent conveyances had run, IWA planned to dissolve RSD and leave Appellee without a tenant or the right to legal redress.  That is fraud, or at a minimum, a scheme that would result in a paramount inequity warranting the disregard of corporate formalities.

At bottom, IWA's fraudulent control of and conveyance to RSD could have imminently caused the very harm that Appellee brought this lawsuit to prevent -- namely, the legal dissolution of its tenant and thus the deprivation of the benefits guaranteed to Appellee by the Lease and the Estoppel Agreement.[5]

Thus, because the jury heard sufficient evidence that IWA controlled RSD and intended to use RSD as a means of evading its obligations to Appellee, we affirm the judgment and the district court's denial of a directed verdict on the issue of alter ego liability.

---

[5] Even where an injury has not yet materialized, a party may still establish standing to raise a claim for relief where such an injury is "imminent," traceable to the defendant, and likely to be redressed by judicial relief. *Nat'l Ass'n of Diversity Officers in Higher Ed. v. Trump*, 167 F.4th 86, 96 (4th Cir. 2026).

23

B.

Evidentiary Exclusions

Appellants next argue that the district court improperly "excluded substantial portions of [their] evidence, including all [of Appellants'] relevant expert evidence." Opening Br. at 43. Appellants specifically allege that three classes of evidence were wrongly excluded: (1) expert testimony from Douglas Bregman and Ian Ratner; (2) evidence of the Camaliers' past use of single purpose entities; and (3) cross-examination of Chris Camalier concerning the 2011 defaults of RSLP on its lease and loan obligations.

1.

Standard of Review

We review a district court's evidentiary rulings for abuse of discretion. *United States v. Jones*, 166 F.4th 428, 434 (4th Cir. 2026). A court abuses its discretion when its decisions are arbitrary or irrational. *Id.* But even when the district court abuses its discretion, we will not order a new trial if the error did not affect the outcome of the proceedings. *Id.*

2.

Expert Testimony

Appellants sought to offer expert testimony from Ratner, an accountant, and Bregman, a real estate lawyer, on two subjects: (a) whether RSD was adequately capitalized for the purpose of the alter ego analysis; and (b) whether it is common industry practice to create single purpose entities close to or at the time of a conveyance, such that

24

the timing of the creation of RSD and its limited scope of operation do not raise an inference of fraudulent intent.

Federal Rule of Evidence Rule 702 controls the admission of expert testimony. That rule states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 empowers trial judges to "act as gatekeepers" who ensure that "any and all [expert] testimony . . . is not only relevant, but reliable." *Sommerville v. Union Carbide Corp.*, 149 F.4th 408, 421 (4th Cir. 2025) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993)).

Here, the district court acknowledged the validity of Ratner's qualifications as an expert in real property transactions. But the court nonetheless barred Ratner's testimony as to the adequacy of RSD's capitalization. In this regard, the court held that rather than providing an expert framework for the jury's analysis, Ratner was merely attempting to "provide[] an answer to a question the jury itself will need to resolve" in the form of a "mere legal conclusion" based on "no information other than [Ratner's] view of how the verdict should read." J.A. 639.

Similarly, the district court concluded that Ratner's testimony with respect to the single purpose entities "fails under *Daubert* . . . because [Ratner] has not applied reliable

25

principles and methods to facts to reach his conclusion." J.A. 639 Instead, the court found that Ratner "does not use *any* principle or method to explain how he has drawn [his] conclusions." *Id.* at 639–40 (emphasis supplied). Similarly, the district court held that Bregman's proffered testimony concerning single purpose entities was "just not relevant" because it "[didn't] really address the unique aspect of [RSD]" within the specific context of the case and was "not based on any specialized knowledge." *Id.* at 673.

Appellants do not explain why the district court's holdings were wrong in their view. They simply misstate the court's reasoning and claim that the court excluded the testimony because it "would have been too persuasive." Opening Br. at 46. Appellants also assert without basis that the testimony should have been admitted because Ratner and Bregman have "'specialized knowledge' that was not 'in the possession of the jurors.'" *Id.* at 47 (quoting *Certain Underwriters at Lloyd's London v. Sinkovich*, 232 F.3d 200, 203 (4th Cir. 2000)).

We find no error with the exclusion of this testimony. As the district court explained, the most obvious issue is that neither Ratner nor Bregman explained what "reliable principles and methods" they employed to reach their respective conclusions. J.A. 639; Fed. R. Evid. 702. Ratner, for example, sought to testify that RSD is adequately capitalized as a matter of law so long as it has enough cash to pay its rent. But Appellants provide no explanation as to *how* Ratner arrived at that conclusion. Without such a theoretical foundation, his pronouncement is merely an opinion as to how the jury should find on a key fact at issue.

26

The same is true of the proffered testimony of both Ratner and Bregman regarding standard industry usage of single purpose entities like RSD. Both witnesses hoped to testify that it is common industry practice to create single purpose entities at or near the time of conveyance and, therefore, to show that the timing of the creation of RSD does not give rise to a reasonable inference of fraudulent intent. But once again, neither Ratner nor Bregman offered any explanation as to *why* that is so. Without that context, their testimony reduces to mere opinion, as it fails to provide the jury with a specialized framework for understanding the facts of the case.

Consequently, we affirm the district court's decision to exclude the testimony of Ratner and Bregman.

### 3.

### The Camaliers' Business Practices

Appellants challenge the district court's exclusion of evidence offered to show that "the Camalier family[] own[s] or manage[s] [single purpose entities] similar [to RSD] to operate their vast Maryland real estate holdings." Opening Br. at 48. Specifically, Appellants sought to introduce evidence of the fact that the Camaliers had once created a single purpose entity, RSLP, to hold and manage the Property. Appellants hoped to use this evidence to rebut Appellee's assertion that IWA used RSD to perpetuate a "scam." *Id.* The district court excluded such evidence. It reasoned that evidence of the Camalier's past use of single purpose entities is not relevant to this case.

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining

27

the action." Fed. R. Evid. 401. Relevant evidence is admissible unless specifically prohibited by a rule of law. Fed R. Evid. 402.

The district court explained that it was "not really sure how any of this information [as to the Camaliers' business practices] bears on whether an appropriate assignment was made or not [between IWA and RSD] and whether or not there was fraud" in that assignment. J.A. 313. The court thus characterized the Camaliers' past practices as "collateral issues" and "ancient history" that had no bearing on any fact at issue in the case. *Id.*

Appellants once again fall short of explaining what it is the district court got wrong. Rather, they simply claim that this exclusion "prevent[ed] [them] from challenging [Chris Camalier's] testimony that RSD was a 'scam.'" Opening Br. at 48.

Again, we discern no abuse of discretion. Certainly, whether IWA used RSD to perpetuate a "scam" is a fact at issue. But it is far from clear how the Camaliers' own use of a different single purpose entity in a different context would aid the jury in deciding whether IWA's use of RSD was or was not fraudulent. Even if Appellants explained as much, they would still need to demonstrate that there are relevant similarities between IWA's use of RSD and the Camaliers' use of RSLP in order to establish relevance. Without that foundation, the jury would have no means of determining whether and why both uses were standard and non-fraudulent, neither were, or one was but not the other.

Thus, as presented, this evidence would merely beg the question of whether IWA created RSD for a non-fraudulent purpose. With no logical bearing on any fact at issue,

28

the evidence thus has no relevance. As a result, we find no abuse of discretion and affirm the district court's exclusion of this class of evidence.

4.

RSLP's Default

Last, Appellants claim that they were wrongly barred from cross-examining Chris Camalier about RSLP's default on its own loan and lease obligations in 2011. The district court precluded such cross-examination as having the potential to confuse and mislead the jury.

"The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "[D]istrict courts have 'broad discretion' in making such determinations, which we may overturn only 'under the most extraordinary circumstances, where that discretion has been plainly abused.'" *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 713 (4th Cir. 2021) (quoting *United States v. Udeozor*, 515 F.3d 260, 265 (4th Cir. 2008)).

When making its ruling, the district court explained, "there really is no issue of the [2011] mortgage foreclosure that the jury needs to consider any further, and the Court specifically finds pursuant to [Rule 403] that it would confuse the issues if we spent any more time on it. It would mislead the jury." J.A. 853.

Appellants do not identify any legal error in connection with the district court's holding. Instead, Appellants argue that as a matter of equity, they should have been

29

permitted to discuss the Camaliers' purportedly unfair business practices in order to contextualize IWA's own conduct.  In Appellants' words, they intended to use this evidence to "show[] the jury that [Chris] Camalier himself had 'stiffed' IWA out of $27 million when he caused [RSLP] to walk away from the Loan in 2011," and thus to challenge the notion that "walking away from a financial obligation in a way that 'stiffs' the counterparty out of [a] contract is fraudulent."  Opening Br. at 48–49.  That is, Appellants wanted to argue to the jury that their conduct must have been fair because Appellee did something similar first.

Whether RSLP "stiffed" IWA in 2011 is fundamentally irrelevant to whether IWA intended to use RSD to evade its own obligations to Appellee.  The cross-examination Appellants sought would, therefore, be far afield from the issues at bar and would present obvious risks of unfairly prejudicing the jury.  Appellants do not even bother to argue to the contrary.  Their briefing all but concedes that this evidence was in fact *intended* to be prejudicial, but that such prejudice is Appellee's just dessert for "stiffing" IWA in 2011.  If Appellants believed that they were wronged by RSLP, they should have sought legal redress when RSLP committed the alleged wrongdoing.  But this case is not the forum for airing those grievances.  Instead, this case concerns IWA's own wrongdoing.  And, in this case, the scope of evidence is limited to facts that aid in proving or disproving Appellee's allegations.  The alleged actions of RSLP in 2011 are far beyond that scope.

Therefore, the district court did not abuse its discretion in excluding as unduly prejudicial any cross-examination related to RSLP's 2011 defaults.

30

C.

Jury Instructions

Last, Appellants argue, "[t]he district court gave legally erroneous instructions to the jury on the issues of Adequate Assurance of Performance, Good Faith and Fair Dealing, and Alter Ego." Opening Br. at 51.

1.

Standard of Review

We review the district court's jury instructions for abuse of discretion. *Gautier v. Tams Mgmt., Inc.*, 163 F.4th 786, 794 (4th Cir. 2026). An instruction is adequate if, construed as a whole, the instruction adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party. *U.S. v. Kokinda*, 146 F.4th 405, 414 (4th Cir. 2025). An instruction is misleading if it includes an incorrect statement of law, a matter which we review de novo. *Id.* But in any event, we will reverse for an erroneous jury instruction only if that "erroneous instruction seriously prejudiced the challenging party's case." *Id.*

2.

Adequate Assurance of Performance

During its discussion of Appellee's wrongful assignment claim, the district court provided the following instruction to the jury:

> A contract imposes an obligation on each party not to impair the other's expectation of receiving due performance. If reasonable grounds for insecurity arise with respect to the performance of either party, the concerned party may demand adequate assurance and due performance. And if you find that reasonable grounds for insecurity do not exist or that the concerned party

31

did not have the right under the parties' agreement to demand such assurances, there would be no obligation for the other party to provide adequate assurances.

After receipt of a justified demand for adequate assurances of performance, failure within a reasonable time to provide assurance of due performance, which is adequate under the circumstances of the particular case, may constitute repudiation of the contract.

J.A. 1413–14.

Appellants argue that the district court's instruction was erroneous for two reasons. First, they argue, "the doctrine of adequate assurance has no applicability to a ground lease." Opening Br. at 53. Second, they argue that even if the doctrine of adequate assurance applies, it could only give rise to a claim for breach against RSD, not a wrongful assignment claim against IWA, and thus the district court should not have raised the issue at all.

Maryland courts treat the Restatements as persuasive authority. *See In re Featherfall Restoration LLC*, 311 A.3d 437, 456 (Md. Ct. App. 2024), *rev'd on other grounds*, 340 A.3d 237 (Md. 2025). Section 251(1) of the Restatement (Second) of Contracts[6] provides that when an obligor has reasonable grounds to believe that an obligee will not perform its obligations pursuant to a contract, the obligor may demand adequate assurance from the obligee of its willingness and ability to perform. If the obligee fails to provide such assurance within a reasonable time, the obligor may treat the obligee's silence

---

[6] In Maryland, a lease for real property is a form of contract subject to ordinary contract law. *See Middlebrook Tech, LLC v. Moore*, 849 A.2d 63, 65 (Ct. Special App. Md. 2004) ("Leases are contracts and, as such, are to be construed by application of the well established rules of contract interpretation.").

32

as repudiation of the contract. *Id.* § 251(2). Repudiation gives rise to a claim for damages for total breach. *Id.* § 253(1).

Granted, as Appellants point out, neither the district court nor Appellee identified any case where a Maryland court has applied the doctrine of adequate assurance to performance of a lease for real property. But, as noted, the Restatement applies the doctrine to all contracts, including leases, and the Restatement is persuasive authority regularly applied by Maryland courts. Thus, it is far from clear that the district court provided an incorrect statement of Maryland law. Further, because the district court couched its discussion of adequate assurance in its instruction on wrongful assignment, it is clear that the purpose of the discussion was to assist the jury to understand the intentions of IWA. The court was instructing the jury that it could infer from the refusal of IWA to provide assurance upon Appellee's reasonable request that IWA understood that RSD was not actually a third party within the meaning of the Estoppel Agreement. That is a reasonable inference and not an abuse of the district court's discretion.

Nonetheless, even if the district court erred, the instruction did not prejudice Appellants. When deciding the issue of wrongful assignment, the district court also instructed the jury to consider (1) whether IWA controlled RSD, such that RSD was "not a real third party" within the meaning of the Estoppel Agreement; (2) whether RSD could independently perform the tenant's obligations pursuant to the Lease; and (3) whether IWA had not actually assigned its rights because it retained the right to dissolve RSD at any time and reclaim its position as the tenant. Based on those alternative considerations alone, the jury had more than enough evidence to find that IWA breached its obligations pursuant to

33

the Lease and the Estoppel Agreement. Thus, even if the instruction was erroneous, it made no difference in the outcome of the case.

Thus, finding no prejudicial error, we affirm the district court's instruction to the jury that a failure to provide adequate assurance may constitute evidence of fraudulent intent within the context of this case.

3.

### Good Faith & Fair Dealing

In a single brief paragraph, Appellants contend that the district court erroneously instructed the jury on the issue of good faith and fair dealing. The error, they assert, was again in the court's discussion of adequate assurance. In Appellants' framing, the doctrine of adequate assurance does not apply, yet the court's good faith instruction "expressly incorporated the adequate assurance instruction, erroneously authorizing the jury to find the information requests constituted as a basis [sic] for the jury to find IWA breached its implied duty [of good faith]." Opening Br. at 53–54.

Appellant's argument is factually incorrect. The district court instructed the jury on the doctrine of good faith and fair dealing as an element within its discussion of wrongful assignment, just as it did with the doctrine of adequate assurance. The court also expressly distinguished the good faith requirement and the doctrine of adequate assurance. As the court correctly explained, a failure to provide adequate assurance can constitute repudiation and breach by the unresponsive party and thus establish a cause of action for the party requesting assurance. Good faith, by contrast, can only serve as an element of an

34

independent cause of action. *See Daljaco, Inc. v. Baugh*, 348 A.3d 914, 196–97 (Ct. App. Md. 2025).

Appellants do not identify any other allegedly prejudicial error in the district court's good faith instruction. Consequently, we affirm the district court's instruction on this issue.

4.

Alter Ego Liability

Finally, Appellants argue, "[t]he district court [erroneously] instructed the jury to evaluate [Appellee's] alter ego claim under a preponderance of the evidence standard," rather than for "clear and convincing evidence." Opening Br. at 54.

In Maryland, "the burden of proof in a civil cause of action based on fraud . . . is [proof] by clear and convincing evidence." *Krouse v. Krouse*, 617 A.2d 1098, 1102 (Md. 1993) (emphasis omitted). And the district court did instruct the jury that alter ego liability, which in this case is based on an allegation of fraud, "applies when the plaintiff shows [all the elements] by a preponderance of the evidence." J.A. 1417. That instruction was erroneous.

However, the error was harmless because the district court also instructed the jury, "[Appellee] has the burden of proving each of the elements of . . . fraudulent conveyance by . . . clear and convincing evidence." J.A. 1408. Beyond that, the verdict form asked, "[d]id [Appellee] prove by clear and convincing evidence that IWA conveyed its interest in the Lease to RSD with the intention to hinder, delay, or defraud [Appellee]?" *Id.* at 1548. The jury answered in the affirmative.

35

As a result, we see no error that prejudiced Appellants' substantial rights and affirm the district court's instruction to the jury on alter ego liability.

### III.

For the foregoing reasons, the district court is

*AFFIRMED*.